UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT BURCICKI, et al.,

                     Plaintiffs,                      No. 02-CV-70230-DT

vs.                                      Hon. Gerald E. Rosen

NEWCOR, INC., et al.,

                      Defendants.
_____/

OPINION AND ORDER ADDRESSING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____March 23, 2010_____

PRESENT:  Honorable Gerald E. Rosen
                      Chief Judge, United States District Court

## I. INTRODUCTION

On January 18, 2002, Robert Burcicki, William Burr, Paul Czekis, George

DeGraeve, Frank Zaparanuk, Leonard Kuk and Edgar Pettey, seven retired employees of

Defendant Newcor, Inc. and/or Newcor's subsidiary, Defendant Newcor M-T-L, Inc.,[1]

instituted this action seeking declaratory and injunctive relief and damages for breach of a

collective bargaining agreement pursuant to Section 301 of the Labor Management

_____

[1] At one time or another in the past, Newcor M-T-L was also known as Newcor
Machine Tool, Inc., Detroit Tool and Machine, and Dearborn Tool and Die.

Relations Act, 29 U.S.C. § 185 (the "LMRA"), and seeking to recover benefits due and to declare the right to future benefits due under an employee benefit plan pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"). At issue in the case is the Plaintiffs' claim that they were guaranteed lifetime health care benefits when the operations at Newcor's two Dearborn, Michigan facilities were terminated in 1985 and 1991. According to their Complaint, they were provided medical benefits as promised for more than a decade, but in November 2001, they were informed that Defendants intended to terminate their retiree health care benefits effective December 31, 2001.

Shortly after Plaintiffs filed their Complaint, but before either Defendant filed an Answer, Newcor, Inc., and its various subsidiaries, including Defendant Newcor M-T-L, Inc., filed for Chapter 11 bankruptcy.[2] In light of the automatic bankruptcy stay, this case was thereafter administratively closed. The Order for Administrative Closing provided that after the bankruptcy stay was lifted, the case could be re-opened on the motion of any party.

Newcor reorganized and emerged from bankruptcy on December 31, 2002. In accordance with the approved Plan of Reorganization, Newcor M-T-L, Inc. was dissolved

---

[2] Newcor, Inc. and its subsidiaries, Newcor M-T-L, Inc., Deco International, Inc., Deco Technologies, Inc., ENC Corporation, Grand Machining Company, Newcor Foreign Sales Corporation, Plastronics Plus, Inc., Rochester Gear, Inc. and Turn-Matic, Inc., jointly filed for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

in January 2003.  The reorganized Newcor, Inc. continued thereafter to operate.

During and after the bankruptcy action, Newcor allegedly provided Plaintiffs Robert Burcicki, Frank Zaparanuk and George DeGraeve with continuous health care benefits.[3]  On April 22, 2009, however, these three retirees were informed that Newcor intended to terminate their health care benefits effective April 30, 2009.   Therefore, on May 28, 2009, they filed a motion to reopen this case as provided in the Court's April 16, 2002 Order.

On June 10, 2009, the Court entered an Order re-opening the case.  A month later, Plaintiffs Burcicki, Zaparanuk and DeGraeve filed the instant motion seeking a preliminary injunction reinstating their retiree health care benefits pending a decision on the merits in this case.  After settlement discussions failed to resolve the matter, Newcor filed its Answer, responded to Plaintiffs' motion for injunctive relief, and filed a counterclaim against the Plaintiffs.  In its counterclaim, Newcor contends that since January 31, 2003, Plaintiffs Burcicki and Zaparanuk were provided benefits to which they were not entitled and that Plaintiff DeGraeve has been provided benefits to which he was not entitled since 1986.  Newcor, therefore, seeks reimbursement from the Plaintiffs for

---

[3] These three men are the only plaintiffs who are continuing with this litigation. Health care insurance is not an issue with former Plaintiff Paul Czekis.  He allegedly is enrolled in a HAP plan and is still receiving benefits from Newcor.  (Our current Plaintiffs were enrolled in the company's Blue Cross/Blue Shield plan.)  Leonard Kuk is covered by his spouse's plan and, as such, insurance coverage is not an issue with him, either.  Apparently, insurance is also no longer an issue with Edgar Pettey as there is no indication that he is continuing with this action.  The only other originally-named Plaintiff, William Burr, died on April 29, 2004.

the premiums for health care insurance paid on their behalf to Blue Cross and Blue Shield of Michigan.

## II.  PERTINENT FACTS

Prior to 1985, the UAW and its Local 157 were parties to a series of collective bargaining agreements covering hourly production and maintenance employees at Dearborn Tool and Machine Corporation ("Dearborn Tool") facilities at two plants in Dearborn, Michigan, Plant # 1 on Ford Road and Plant # 2 on Diversey Street.  On August 19, 1985, the UAW and Dearborn Tool entered into a Memorandum of Agreement relating to the closing of Dearborn Tool's Diversey Road Plant #2.  [*See* Defendants' Ex. A.]  This Memorandum of Agreement provided that the collective bargaining agreement covering Diversey Plant employees entered into between the Company and the Union on September 13, 1985, "shall be terminated . . . at midnight December 31, 1985."  *Id.*, p.  1.]  All employees at the plant were terminated.  *Id*.

This Memorandum of Agreement also provided that specifically designated eligible employees would be paid a severance package equal to one week's pay for each full year of service with the company as of the date of the employee's permanent layoff, and that the Company would continue for each such eligible employee "Group Hospital, Surgical and Medical coverage for six (6) months following the month in which the permanent layoff occurs. . . ."  *Id.* p. 3.  The Memorandum of Agreement further provided that it was "a final settlement by and between the Company and the Union with respect to the closing of the Plant, and fully and completely release[d] and discharge[d] the

Company and the Union from any and all obligations. . . with respect to the closing of the plant under State, Federal or common law." *Id.*, p.3.

Plaintiff George DeGraeve, who is now 86 years old, worked at Plant #2 for 22 ½ years. He retired when the plant closed in 1985 and was designated in the Memorandum of Agreement as an "eligible employee" entitled to the severance package and continued health insurance coverage as set forth in the Agreement. *See id.,* Appendix "A."

Shortly after Dearborn Tool closed the Diversey Street plant, Newcor purchased the Dearborn Tool plant on Ford Road, and under the name Newcor Machine Tool, Inc. (subsequently changed to "Newcor M-T-L, Inc."), assumed the existing CBA with the UAW. The last CBA between Newcor Machine Tool, Inc. and the UAW was dated September 11, 1989. [*See* Plaintiffs' Ex. 1-A.]

Article XV, Section 8 of the 1989 CBA provided that Newcor Machine Tool would provide retirees with the choice of a Health Alliance Plan or one of the Company's other insured or self-insured plans for hospital, surgical and medical coverage on a share-the-cost basis. [*See* Plaintiff's Ex. 1-A, p. 24]. Pursuant to this cost-sharing provision, employees who retired prior to September 10, 1986, and employees who retired on or after September 10, 1986 with 15 or more years of service, were required to pay 25% of the cost of the health care premium. *Id.* Employees who retired on or after September 10, 1986 with at least 10, but less than 15 years of service were required to pay 50% of the cost of the health care premium. *Id.* The CBA stipulated, however, that

It is understood that the Company's responsibility for providing health care

5

coverage ceases upon the death of the retired employee (or the expiration of
this Agreement or the ceasing of manufacturing operations whichever
comes first.)

*Id.*, p. 25.

Newcor closed the Ford Road plant in the fall of 1991. Prior to the plant closing,

on September 11, 1991, the UAW, UAW Local 157 and Newcor Machine Tool entered

into a Termination Agreement regarding the plant closing. [*See* Defendants' Ex. B.] In

relevant part, this Termination Agreement provided a severance package for those

employees who were "active" employees on the Seniority List as of September 1, 1991.

*See id.*, Articles 3, 4. Pursuant to the Termination Agreement, eligible employees were

paid specified number of weeks severance pay based upon the number of years service as

of September 1, 1991, with a minimum severance package of 2 weeks pay for employees

with 0-5 years seniority and a maximum of 15 weeks pay for employees with 16 or more

years of service. *Id.*, Article 3.

Such active employees on the Seniority List as of September 1, 1991 were also

entitled to continuation of group life; accidental death and dismemberment insurance;

dental; hospital; surgical; and medical coverage as defined in Article XV of the 1989

CBA "for six (6) months following September 30, 1991, or until covered by another

group policy whichever is earlier." *Id.*, Article 4. If not insured at the end of the six (6)

month period, the Company further agreed to provide the right to continue these

insurance plans for 24 additional months by the employee paying the premium in

accordance with COBRA rules. *Id.*

The Termination Agreement also provided for the continuation of insurance coverage for employees who retired prior to December 31, 1991. For such retirees, the Company agreed to provide:

1. Continuation of life insurance for one (1) year following September 1, 1991.

2. Continuation of hospital, surgical and medical coverage in accordance with Article XV, Section 8 of the September 11, 1989 Labor Agreement. The Company reserves the right to revise or change the coverage and/or provider of this coverage to an equivalent program at any time in the future.

3. This coverage will continue for the life of the retiree, only unless Newcor, Inc. (parent company) ceases to be a legal entity or if mandated by law.

*Id.*, Article 4.

Plaintiff Frank Zaparanuk, who is 87 years old, retired from the Ford Road Plant #1 in March 1985 with 16 years of service. He is listed on Appendix B of the Termination Agreement as a "Retiree" as of September 11, 1991. *See id.*, Appendix B. Plaintiff Robert Burcicki, who is 79 years old, was an active employee on the Newcor Machine Tool Seniority List as of September 1, 1991, *see id.*, Appendix A, and was also Local 157's Chief Steward at the plant. He signed the 1991 Termination Agreement on behalf of the Union on September 11, 1991, and retired prior to December 31, 1991 "so that [he] would have lifetime health care coverage." *See* Declaration of Robert Burcicki, Plaintiff's Ex. 1, ¶ 7.

After the execution of the 1991 Termination Agreement, Defendants continued to provide medical insurance benefits to Plaintiffs Zaparanuk and Burcicki. For some

unexplained reason, Plaintiff DeGraeve, who retired in 1985 at or about the time of the

closing of the Diversey Street Plant #2, also continued to receive medical coverage.

DeGraeve's coverage, however, was not pursuant to any contractual obligation, as the

Memorandum of Agreement pertaining the closing of the Diversey Plant where he had

worked contained no provision for "lifetime" retiree benefits.

Plaintiffs allege that they were informed by letter dated November 30, 2001 that

the Company intended to terminate their retiree health care benefits effective December

31, 2001. *See* Complaint ¶ 23.[4] On January 18, 2002, Plaintiffs filed this lawsuit.

Defendants thereafter continued medical insurance benefits for the Plaintiffs on a

month-to-month basis until Newcor, Inc., Newcor Machine Tool (then known as "Newcor

—T-L), and Newcor's other subsidiaries filed jointly for Chapter 11 bankruptcy

protection on February 25, 2002.

Defendants continued to provide Plaintiffs with health care benefits during the

bankruptcy proceedings and, in Newcor's First Amended Plan for Reorganization

assumed "all compensation and benefit plans of the Debtors applicable to their

employees." *See* First Amended Plan, Plaintiffs' Ex. 3-B, p. 19. On December 31, 2002,

the Bankruptcy Court entered its Order Confirming the First Amended Plan of

Reorganization. *Id.* Ex. 3-A.

In its Order, the Bankruptcy Court approved the "substantive consolidation of the

---

[4] Although Plaintiffs allege they were notified by letter, no such letter has ever
been provided to the Court.

Debtors as contemplated in and to the extent set forth in Article II and Section V.K of the [First Amended] Plan." *Id.* at p. 11. The Order and Plan further provided that "all assets and liabilities of all Debtors will be treated as though the Debtors were merged" and "any obligation of any Debtor and all guarantees thereof executed by one or more of them will be deemed to be the obligation of the consolidated Debtors." *Id.* Order at p. 11; Plan at p. 18. The Order and Plan further specifically recognized the assumption by the surviving company, Newcor, Inc., of the obligation to provide medical benefits to Newcor's and its subsidiaries' retirees:

> With respect to continuation of all retiree benefits, . . . Section VI.E [of the Plan] provides that, except as otherwise expressly provided in the Plan, all employment and severance agreements, and all compensation and benefit plans of the Debtors applicable to their employees, other than the Defined Benefit Pension Plans, shall be treated as executory contracts under the Plan and on the Effective Date will be deemed assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

*Id.* Order at pp. 9-10; *see also* Plan, Article VI, § E at p. 19.

After confirmation of the First Amended Plan, Newcor M-T-L was dissolved on or about January 13, 2003. *See* Plaintiffs' Ex. 1-C.

The reorganized Newcor, Inc., however, continued to provide Plaintiffs with medical insurance benefits until April 30, 2009. In March 2009, Newcor sent Plaintiff DeGraeve a letter informing him that it intended to terminate his health care benefits effective April 30, 2009. *See* Defendants' Response to Plaintiffs' Interrogatory No. 4, Exh. B. to Plaintiffs' Motion to Schedule Hearing on Motion for Preliminary Injunction. On April 22, 2009, Newcor sent Plaintiffs Burcicki and Zaparanuk and DeGraeve such

9

letters  *See id.  See also,* Plaintiffs' Ex. 1-C.  The letter sent to Plaintiff Burcicki[5] stated,

in relevant part:

> Newcor Machine Tool, Inc. closed its operations and went out of business at the end of 1991.  On January 13, 2003, Newcor Machine Tool, Inc. was dissolved and the dissolution was recorded in the records of the State of Michigan.
>
> For some reason, which we have not been able to determine, NEWCOR, Inc. continued paying for your medical insurance for more than six (6) years after the obligation of Newcor Machine Tool, Inc. ended.  Effective immediately, that error will be corrected and your supplemental BCBS medical insurance will terminate as of Thursday, April 30, 2009.
>
> Further, we will need to make arrangements with you to reimburse us for the monies we have paid out on  your behalf these many years after Newcor Machine Tool, Inc.'s obligation to provide medical insurance ended.
>
> For the calendar year 2008, we advanced $626.93 per month for you and your wife, for a total of $7,523.16.  For the current calendar year, 2009, we have advanced $654.05 for the months of January, February, March and April, for a total of $2,616.20.
>
> The total due from you for the coverage from January 1, 2008 through April 30, 2009 is $10,139.36, less the $4.54.12 amount, which you paid in advance for coverage for May and June of 2009.  This leaves a balance of $9,685.24.  Pleas contact the undersigned at (248) 409-1070, ext. 222 to make arrangements to repay the above advances.
>
> We are starting our research now to calculate the amounts that we advanced on your behalf for the period from January 13, 2003 through December 31, 2007, during which we paid for your medical insurance coverage.  As we are able to determine the amounts  you owe for prior periods, we will forward the appropriate bills to you.

*Id.*

---

[5]  Only Burcicki's letter has been provided to the Court.

10

In light of this notification of Newcor's intent to terminate their retiree health care benefits and to recover amounts paid by the company for Plaintiffs' health insurance since the reorganization of Newcor, Inc., on May 28, 2009, Plaintiffs moved to reopen this case and on June 10, 2009, the Court entered an order reopening the case and reinstated the matter to the Court's active docket. Plaintiffs thereafter filed the instant motion for preliminary injunction.

## III. ANALYSIS

### A. STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Further, "[t]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Id.*[6]

In deciding whether a plaintiff is entitled to a preliminary injunction, the court is to utilize the traditional four-factor test for injunctive relief:

(1)     The likelihood of plaintiff's success on the merits; and

---

[6] Whereas on a motion for summary judgment a plaintiff need only create a jury issue, "[t]o obtain a preliminary injunction he not only ha[s] to demonstrate specific harm, but also carry the burden of persuasion, showing a likelihood of success on the merits." *Leary v. Daeschner, supra*, (quoting *National Wildlife Fed'n v. Burford*, 878 F.2d 422, 432 (D.C. Cir. 1989), *rev'd on other grounds sub nom, Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990)).

(2) Whether the injunction will save the plaintiff from irreparable injury;
(3) Whether the injunction will harm others; and
(4) Whether the public interest will be served by the injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). *See also, Superior Consulting Company, Inc., v. Walling, supra*, 851 F. Supp. 839, 846 (E.D. Mich. 1994). These factors are to be balanced and are not considered prerequisites that must be met. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.* The degree of proof necessary for each factor depends on the strength of the plaintiffs' case on the other factors. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Moreover, the court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive. *Jones*, *supra*.

1. <u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>

Plaintiffs here contend that they are likely to succeed on the merits of this case because they can prove they have a "vested" right to the health insurance benefits. To prove this, the plaintiffs must show that the defendant and their union intended to include a right to lifetime benefits when they negotiated the agreements pertaining to the Dearborn plant shutdowns at issue here.

A retiree health insurance benefit plan is a welfare benefit plan under ERISA. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir.2000)(citing *Boyer v. Douglas*

*Components Corp*., 986 F.2d 999, 1005 (6th Cir.1993)).  However, unlike pension plans, welfare benefit plans are not subject to mandatory vesting requirements under ERISA. *Id*. Thus, courts have held that after a collective bargaining agreement expires, "an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Yolton v. El Paso Tennessee Pipeline Co*., 435 F.3d 571, 578 (6th Cir. 2006) (quoting *Bittinger v. Tecumseh Prod. Co.*, 83 F. Supp. 2d 851, 857 (E.D.Mich.1998)).  The parties to a collective bargaining agreement may agree, however, that the benefits provided for in the  agreement will vest and thus survive the termination of the CBA.  *Maurer*, 212 F.3d at 914.  "To vest benefits is to render them forever unalterable." *Sprague v. General Motors Corp*., 133 F.3d 388, 400 (6th Cir.1998) (*en banc*). If the parties intended the benefits to vest for the lifetime of the retirees, the employer's unilateral modification or reduction of those benefits will constitute an LMRA violation. *Id*. (citing *Armistead v. Vernitron Corp*., 944 F.2d 1287, 1298 (6th Cir.1991)).

In *UAW v. Yard-Man, Inc*., 716 F.2d 1476 (6th Cir. 1983), the Sixth Circuit set forth the guiding principles for determining whether the parties to a collective bargaining agreement intended for retiree health insurance benefits to vest.  Pursuant to these principles, courts must apply basic rules of contract interpretation to discern the intent of the parties:

> The court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. . . .  The court should also interpret each provision in question as part of the integrated

whole.  If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.  Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.  Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous.  Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*Id*. at 1479-1480 (citations omitted).  Courts should look to extrinsic evidence to determine the parties' intent only when the terms of the contract are ambiguous. *Id*. at 1480.

Considering the context in which the benefits at issue arose in *Yard-Man*, the Sixth Circuit went on to note that since benefits for retirees are only permissive rather than mandatory subjects of collective bargaining, "it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations."  *Id.* at 1482 (citations omitted).  Thus, the court noted, there is an inference that retiree benefits will vest:

[R]etiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained.  Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.

*Id.*

In *Yolton v. El Paso Tennessee Pipeline, supra*, however, the Sixth Circuit

clarified the *Yard-Man* inference and emphasized that, in the end, it is simply ordinary

principles of contract interpretation that control:

> Under *Yard-Man* we may infer an intent to vest from the context and already sufficient evidence of such intent. Absent such other evidence, we do not start our analysis presuming anything. If *Yard-Man* required a presumption, the burden of rebutting that presumption would fall on the defendants. However, under *Yard-Man*, "[t]here is no legal presumption that benefits vest and that the burden of proof rests on plaintiffs." *Maurer*, 212 F.3d at 917. This Court has never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent. Rather, the inference functions more to provide a contextual understanding about the nature of labor-management negotiations over retirement benefits. That is, because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are "typically understood as a form of delayed compensation or reward for past services" it is unlikely that they would be "left to the contingencies of future negotiations." *Yard-Man*, 716 F.2d at 1481-82 (citations omitted). When other contextual factors so indicate, *Yard-Man* simply provides another inference of intent. All that *Yard-Man* and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation.

*Yolton*, 435 F.3d at 579-80.

The Court, therefore, will examine the agreements at issue in accordance with the

*Yard-Man* principles, as clarified by *Yolton.*

The 1985 Memorandum of Agreement and the "Retirement" of Plaintiff DeGraeve

Plaintiff George DeGraeve's retiree health benefits are governed by the

Memorandum of Agreement between the UAW and Dearborn Tool & Machine

Corporation Plant # 2, dated August 19, 1985. (Mr. DeGraeve retired when Plant # 2

closed in December 1985. *See* DeGraeve Affidavit, Plaintiffs' Ex. 5, ¶ 4.) This

Agreement provides that

The Company shall continue for each eligible employee Group Hospital, Surgical and Medical coverage **for six (6) months following the month in which the permanent layoff occurs** or until covered by another group policy, whichever is less.

Plaintiffs' Ex. 2, ¶ 4 (emphasis added).

Nothing in this Agreement evidences an intent that health care coverage continue for life. Although the Agreement references a "Labor Agreement dated September 13, 1983. . . covering the Company's factory, production and maintenance employees," *see id.,* p. 1, Paragraph 1 of the 1985 Memorandum of Agreement states that that Labor Agreement "shall be terminated. . . at midnight December 31, 1985," *id.*, and Paragraph 6 expressly provides that "[t]his [August 19, 1985] Agreement supersedes and modifies all previous agreements between the parties whether expressed or implied."

Plaintiffs argue in their Reply Brief that DeGraeve falls within the coverage of the 1991 Termination Agreement pertaining to the later closing of Defendants' Ford Road Plant and that Agreement's provision for "continuation of hospital, surgical and medical coverage in accordance with Article XV, Section 8 of the September 11, 1989 Labor Agreement" for "employees who have retired prior to December 31, 1991." *See* Plaintiffs' Ex. 1-B, Article 4.B.2 . However, there is nothing in this 1991 Agreement that suggests that it was intended to cover employees who "retired" pursuant to the December 1985 "permanent layoff" of employees at the Diversey Street Plant # 2 upon its closing. Plaintiffs allege that former Plaintiff Burr and another employee who is not a party to this action, Carl Csupecz, had retired from the Diversey Street Plant # 2 prior to the plant's

closing[7] and are listed as covered "retirees" on Appendix B of the 1991 Agreement. However, no evidence has been presented concerning either of these individuals' employment or retirement. The Court notes, however, that with respect to retiree insurance, the 1991 Termination Agreement covered only "current, normal and total disability retirees being covered by the Company on September 9, 1986." *See* Plaintiffs' Ex. 1-B, Article 4.B.2 and Ex. 1-A, § 8. Plaintiff DeGraeve's "retirement" was not a "normal" retirement as apparently was the case with Mr. Burr's retirement which predated the plant closing. Rather, his severance from Dearborn Tool & Machine Corporation was designated a "permanent layoff." *See* Plaintiffs' Ex. 2, ¶ 3. This is further evidenced by the Appendices to both the 1985 and 1991 Agreements. Plaintiff DeGraeve is listed as a covered "Eligible Employee" on Appendix A of the 1985 Agreement, *see* Plaintiffs' Ex. 2, ¶ 3 and Appx. A, and the provision in the Agreement concerning the six-month continuation of medical insurance applies to "eligible employee[s]." *Id.* ¶ 4. DeGraeve is <u>not</u> listed in the 1991 Agreement as either a covered employee on Appendix A or a covered retiree on Appendix B. *See* Defendants' Ex. B, Appx. A-B.[8]

---

[7] Plaintiffs only allege in their Complaint that Plaintiff Burr retired "in the early 80s," with nothing indicating at which plant he worked prior to his retirement. *See* Complaint, ¶ 6. There are no allegations in the Complaint and no evidence whatsoever has been presented concerning Carl Csupecz's employment or retirement.

[8] Although Plaintiffs appended a copy of the 1991 Termination Agreement to Plaintiff Burcicki's Affidavit, Appendix A and Appendix B were not included. The appendices were, however, attached to Defendants' Ex. B.

Based upon the foregoing, the Court concludes that Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits with respect to the claims of Plaintiff DeGraeve.

The 1991 Termination Agreement and the Retirement of Plaintiffs Burcicki and Zaparanuk

Plaintiffs Burcicki and Zaparanuk retired from Newcor Machine Tool's Ford Road Plant (Plant # 1) and, as such, are covered by a different agreement, i.e., the Termination Agreement concerning the Ford Road Plant's closing. *See* Burcicki Affidavit, Plaintiffs' Ex.1, ¶ 1 and Defendants' Response Ex. B; Zaparanuk Affidavit, Plaintiffs' Ex. 4, ¶ 4. Zaparanuk retired in 1985, *id., ¶* 4, and Burcicki retired in December 1991, shortly before the plant closed. Burcicki Affidavit, Plaintiffs' Ex.1, ¶¶ 3, 7. Burcicki was the UAW's Chief Steward at the plant, and he participated in the negotiations and was one of the signatories of Termination Agreement concerning the plant's closing. *Id.* ¶¶ 5-6.

The Termination Agreement provided for a continuation medical insurance coverage for six months for "active employees." *See* Defendants' Ex. B and Plaintiffs' Ex. 1-A, Article 4, Section A. The Agreement also provided:

B.    For employees who have retired prior to December 31, 1991:

* * *

2.    Continuation of hospital, surgical and medical coverage in accordance with Article XV, Section B of the September 11, 1989 Labor Agreement. The Company reserves the right to revise or change the coverage and/or provider of this coverage to an equivalent program at any time in the future.

3.    This coverage will continue for the life of the retiree, only if Newcor, Inc. (parent company) ceases to be a legal entity or if mandated by law.

18

*Id.*, Section B, ¶¶ 2-3.

Defendants do not dispute that the Termination Agreement expressed in clear and unambiguous language the intent that Plaintiff Burcicki's and Zaparanuk's medical insurance coverage "will continue for the life of the retiree," with the only limitations to such lifetime coverage being if Newcor, Inc., the parent company of Newcor Machine Tool, Inc., "ceases to be a legal entity" or "if mandated by law."   Defendants, however, argue, the Plaintiffs are precluded from bringing this action, and hence, have not shown a likelihood of success on the merits.  They contend that Plaintiffs' sole remedy is to demand arbitration pursuant to Article 10 of the Termination Agreement which provides, as follows:

Article 10

Dispute Resolution

> All disputes or claims arising out of any alleged violation of the CBA, its modifications as contained herein, and this Termination Agreement will be resolved by arbitration in accordance with the voluntary arbitration rules of the American Arbitration Association.  The decisions of the arbitrator shall be final and binding.  Expenses of the arbitrator shall be shared equally. Any dispute or claim hereunder must be submitted to arbitration within thirty (30) calendar days of either parties' written, final answer to the dispute raised by the other party, or it shall be waived.

Defendants' Ex. B, Art. 10.

Plaintiffs disagree with Defendants.  They contend that because they are retirees, as opposed to active employees, they are not subject to the arbitration provision and may pursue their claims personally and directly against Newcor in this Court.

In deciding the arbitrability of this dispute, the Court begins with the presumption that national labor policy favors arbitration. *United Steelworkers of America v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007).  In *Cooper Tire*, the Sixth Circuit synthesized four principles set forth by the Supreme Court in the *Steelworkers* trilogy[9] and later collected in *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), to guide lower courts in their analysis. Those principles have been summarized as follows:

> 1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; 2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is a question for judicial determination; 3) in making this determination, a court is not to consider the merits of the underlying claim; and 4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Cooper Tire & Rubber Co.*, 474 F.3d at 277-78 (6th Cir. 2007). (quoting *Int'l Union v. Cummins, Inc*., 434 F.3d 478, 485 (6th Cir.2006) (internal citation omitted)).

In cases involving broad arbitration clauses, the presumption of arbitrability is "particularly applicable," and only an express provision excluding a particular matter

---

[9]  *United Steelworkers v. Am. Mfg. Co*., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp*., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

from arbitration or "'the most forceful evidence of a purpose to exclude,'" can prevail. *United Steelworkers of Am. v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir.1994) (quoting *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415 (internal citation omitted)).

In *Litton v. Financial Printing v. NLRB*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), the Supreme Court held that when an action taken after a collective bargaining agreement has expired infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement, a dispute concerning the right must be arbitrated. 111 S.Ct. at 2225. Once it is determined that a claim arises under a contract, the policy favoring arbitration makes it "presume[d] as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate" upon the expiration of the agreement. *Id.* at 2226. In sum,

> [I]f a collective-bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions.

*Litton*, 501 U.S. at 207-08, 111 S.Ct. at 2226.

Applying the foregoing principles, the Sixth Circuit and a number of other circuits have applied the presumption of arbitrability to disputes involving retirees' benefits. *See e.g., Cleveland Elec. Illuminating Co. v. Util. Workers Union*, 440 F.3d 809, 816 (6th Cir.2006) ("[T]he presumption of arbitrability applies to disputes over retirees' benefits if the parties have contracted for such benefits in their [CBA]. . . ."); *Excelon Generation*

*Co. v. Local 15, Int'l Broth. of Electrical Workers*, 540 F.3d 640, 646-47(7th Cir. 2008);

*United Steelworkers of Am. v. Retirement Income Plan for Hourly-Rated Employees of*

*ASARCO, Inc.*, 512 F.3d 555, 560-61 (9th Cir.2008); *United Steelworkers of Am.,*

*AFL-CIO v. Canron, Inc.*, 580 F.2d 77, 82 (3d Cir.1978). *But see Anderson v. Alpha*

*Portland Indus., Inc.*, 752 F.2d 1293, 1295-98 (8th Cir.1985).

In this case it is even more clear that Plaintiffs' claims for retiree health insurance

benefits arising under the Termination Agreement should be arbitrated because here, in

addition to the CBA's grievance procedure which provides for arbitration of employee

grievances, the Termination Agreement, itself, contains a separate and specific arbitration

which requires that "[a]ll disputes or claims arising out of . . . this Termination

Agreement . . . be resolved by arbitration in accordance with the voluntary arbitration

rules of the American Arbitration Association."  *See* Termination Agreement, Article 10,

Plaintiffs' Ex. 1-B; Defendants' Ex. B.

In support of their opposition to arbitration, Plaintiffs rely upon *UAW v. Yard-*

*Man, Inc., supra*, 716 F.2d 1476, claiming that *Yard-Man* establishes that in the Sixth

Circuit retirees cannot be forced to arbitrate a dispute concerning vested health care

benefits.  Plaintiffs' selective quotations from the case misrepresent *Yard-Man*'s holding.

*Yard-Man* involved the appeal of a company from a summary judgment ruling

finding that the company had breached the collective bargaining agreement it had entered

into with the UAW that covered employees at Yard-Man's Jackson, Michigan plant by

terminating the life and health insurance benefits of retired employees upon the expiration

of the collective bargaining agreement (three years after the Jackson plant closed) and in substituting the payment of present cash value for its bargained obligation to purchase annuities to fund supplemental pension benefits. The Jackson plant closed in 1975. The collective bargaining agreement expired two years later, on June 1, 1977.

In April 1977, Yard-Man notified its Jackson retirees that existing health and life insurance benefits would terminate upon the expiration of the CBA. Soon thereafter, the UAW filed grievances claiming that Yard-Man's unilateral action in terminating the retirees' insurance benefits violated the CBA. Yard-Man refused to arbitrate; therefore, the UAW filed an action under § 301 of the LRMA, seeking to compel arbitration. (Alternatively, the union sought, on behalf of the retirees, specific performance of Yard-Man's obligation to provide insurance benefits beyond the term of the CBA and damages to compensate retirees who had paid insurance premiums or medical expenses since the CBA's expiration.) In a second count, the UAW requested specific performance of Yard-Man's acknowledged obligation under the CBA to purchase annuities to fund its supplemental pension plan. After the suit was filed and without notice or consultation with the UAW, Yard-Man distributed lump sum payments of the present value of the supplemental pension rights directly to each retiree.

The UAW subsequently waived its demand for arbitration and the parties filed cross-motions for summary judgment. The district court found that Yard-Man had breached its contractual obligations when it cancelled the retiree's insurance upon expiration of the collective bargaining agreement. The district court also found that Yard-

Man had not complied with its contractual obligation to purchase annuities to fund the supplemental pension plan by making lump sum payments to the retirees. Yard-Man appealed.

The Sixth Circuit divided its ruling into two parts. First, the court examined the CBA and determined that the retirees had "vested" rights to insurance benefits thereby entitling them to nonterminating lifelong insurance benefits even after the CBA expired.[10] In Part II of the decision, the Sixth Circuit addressed the issue of Yard-Man's substituted performance by paying lump sums to retirees in lieu of purchasing annuities for supplemental pension benefits as called for under the CBA. The union sought to hold Yard-Man to the precise terms of the CBA, deeming Yard-Man's substituted performance non-compliant. Yard-Man argued in defense, "accord and satisfaction," and estoppel.

As the Sixth Circuit saw it, the contentions of the parties with regard to Yard-Man's lump sum payments in lieu of purchasing annuities to fund the supplemental pension plan raised two legal issues:

> First, whether retirees may, consistent with federal labor law, settle their contractual disputes over [supplemental pension] benefits directly with their former employer by means of accord and satisfaction without notice to or the consent of their union? Second, even if they may, are such direct settlements between retirees and the former employer, entered into without notice to or consent of the union, precluded once the union undertakes the legal representation of the retirees in an § 301(a) litigation?

716 F.2d at 1484.

---

[10] It is this "vesting" part of *Yard-Man* for which this case is repeatedly cited in employee benefits cases.

As is evident from the foregoing, arbitration of the dispute was not at issue in the case. Plaintiffs, nonetheless, quote selective, segmented excerpts from the court's ruling rejecting Yard-Man's accord and satisfaction defense in arguing in their Reply Brief that Circuit law prohibits requiring retirees to arbitrate disputes with their former employers.

It was with respect to the appellate court's ruling that retirees were not required to give notice to or obtain the concurrence of the union with regard to a settlement a retiree might reach with his former employer that the Sixth Circuit found that union retirees differ from active union employees. The court observed that statutorily, pursuant to 29 U.S.C. § 159(a) direct "'adjustments' between an employer and employee are permitted without intervention of the union. . . so long as the union has been given an opportunity to be present," whereas "[t]here is no provision parallel to § 159(a) relating to settlements between retirees and former employers." *Id.* Summarizing its examination of Section 159(a), the court stated, "Unlike the active employees, retirees face no restrictions whatever in seeking fulfillment of contractual benefits directly from their former employer." *Id.*, 716 F.2d at 1484-85. Plaintiffs quote this one sentence out of context, contending that it means that they are entitled to pursue their claims for the continuation of their health insurance coverage in this litigation in this Court. *See* Plaintiffs' Reply Brief, p. 2. Nothing, however, in the discussion in *Yard-Man* in any way suggests that retirees who obtain health care benefits pursuant to an explicit Termination Agreement which contains its own explicit arbitration provision may not be bound by that arbitration

provision.[11]

Similarly, Plaintiffs misapprehend the rulings in *Cleveland Electric Illuminating Co. v. Utility Workers*, 440 F.3d 809 (6th Cir. 2006) and *Cooper Tire & Rubber, supra*, from which they also quote in their Reply Brief. Contrary to what Plaintiffs' selective quotations would suggest, however, neither of those cases had anything to do with compelling individual union retirees to arbitrate their dispute. Rather, both of those cases merely held that the retirees were not required to have their union litigate their disputes for them nor could the union force its representation upon the retirees. Both *Cleveland Electric* and *Cooper Tire* held that before *the union* could litigate a union retiree's § 301

---

[11] Plaintiffs also quote a segmented excerpt from a footnote in *Yard-Man* -- also contained in the Sixth Circuit's discussion of the accord and satisfaction defense -- stating that "the exclusivity of contractual and arbitration remedies -- does not exist in the context of retirees who, without restraint, may litigate their disputes with their former employers directly under § 301." *See* Plaintiffs' Reply Brief, p.2, quoting *Yard-Man*, 776 at 1486 n. 16. The full text of the footnote, however, which is devoted to refuting Judge Holschuh's dissent, demonstrates Plaintiffs' misrepresentation of what the Sixth Circuit said. Footnote 16 states:

> The dissent strongly implies that a union's duty to fairly represent the claims of its members extends to retirees. This proposition overlooks that the very rationale for creating a duty of fair representation -- the exclusivity of contractual grievance and arbitration remedies -- does not exist in the context of retirees who, without restraint, may litigate their disputes with their former employers directly under § 301. *See Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Pittsburgh Plate Glass*, 404 U.S. at 181 n. 20, 92 S.Ct. at 396 n. 20. However, since this issue is not squarely presented by the facts of the present case, we leave its ultimate resolution for another time.

716 F.2d at 1486 n. 16.

claim for breach of a collective bargaining agreement, it had to obtain the consent of the retiree.

Plaintiffs' final argument is that because the only signatory parties to the Termination Agreement were Newcor and the UAW, the Dispute Resolution provision in the Termination Agreement must be read as addressing only the obligations of those two parties, and, therefore, only Newcor and the union can be compelled to arbitrate; individual retirees covered by the Agreement cannot be compelled to arbitrate their disputes. If all that we were dealing with was a general employee grievance arbitration provision contained in a collective bargaining agreement that provided for retiree medical benefits, Plaintiffs' argument might have some merit. *See e.g., Rossetto v. Pabst Brewing Co.*, 128 F.3d 538 (7th Cir. 1997) (holding that a CBA's arbitration provision providing for arbitration of "all grievances. . .between the Company and its employees [that] cannot be satisfactorily settled" in the grievance process was insufficient to establish that the company agreed to arbitrate disputes over retiree medical benefits). However, as the court observed in *Exelon Generation Company v. Local 15, Int'l Broth. of Elec. Workers*, *supra*, not all collectively-bargained arbitration agreements are equal:

> [T[here is a critical distinction between the CBA in *Rossetto* and the one in this case: The CBA in *Rossetto* expressly defined an arbitrable grievance as one between Pabst and an "employee." And retirees are not employees. The CBA here, however, does not define an arbitrable grievance as one between the company and an employee. Nor does the CBA in this case expressly restrict arbitration to grievances by employees. The arbitration provision is broader than that. . . . [It] applies to "*any* dispute or difference . . . between the Company and the Union *or its members* as to the interpretation or application of the provisions of this Agreement. . . ."

27

540 F.3d at 645-46 (emphasis supplied).

In *Seborowski v. Pittsburgh Press Co.* 188 F.3d 163 (3d Cir. 1999), individual former employees of the Pittsburgh Press and beneficiaries of deceased employees who were part of the bargaining unit covered by a collective bargaining agreement entered into between Pittsburgh Press and the Pittsburgh Typographical Union No. 7, brought suit in federal court alleging a breach of contract claim under Section 301 of the LMRA and a breach of fiduciary duty claim under ERISA when Pittsburgh Press deducted certain sums from the amounts it had contractually agreed to contribute to the former employees' pension plans pursuant to a separate Bonus Incentive Compensation Plan Agreement ("BICPA") entered into as part of a plan to reduce the newspaper's union workforce. Over the plaintiffs' opposition, the district court ordered that the dispute be arbitrated pursuant to the arbitration provision contained in the agreement. The former employees appealed contending that the district court erred in ordering the matter arbitrated contending that they "are not parties to the [BICPA] and collective bargaining agreement" and because "[t]hese agreements do not authorize or require [former employees] to arbitrate any dispute." 188 F.3d at 168. The Third Circuit rejected the appellants' argument:

> Appellants are current and former employees and beneficiaries of deceased employees who were part of the bargaining unit covered by the BICPA and the collective bargaining agreement negotiated by the Union, the unit's exclusive bargaining representative. It is clearly established that all terms of a collective bargaining agreement, like the BICPA, are binding on the individual employees represented by the union. Thus, Appellants' protestations that they are not parties to the BICPA and that they are not

bound by the BICPA arbitration provision are arguments that run counter to ruling case law. Appellants seek to have the benefits of collective bargaining without assuming responsibilities of the process.

*Id.*

Applying federal labor policy, the *Seborowski* court also rejected the appellants' argument that only the union could initiate arbitration and that the former employees and beneficiaries of deceased former employees, as individuals, could not do so:

> In general, "federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as a mode of redress." *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *see also Vaca* [*v. Sipes*], 386 U.S. [171,] 184, 87 S.Ct. 903 [(1965)] ("Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement.").  Appellants did not attempt to initiate arbitration.
>
> There is an exception by which an employee may circumvent the established grievance procedures in a collective bargaining agreement and proceed directly to civil litigation:  when the union breaches its duty to represent fairly employees in the handling of contractual disputes. *Vaca*, 386 U.S. at 186-188, 87 S.Ct. 903. But there is no basis for application of this exception because Appellants have not contended that the Union wrongfully refused to pursue their cause.  Indeed, they never even attempted to present their cause to the Union.

188 F.3d at 168.

The same is true in this case -- there is no evidence that Plaintiffs ever attempted to present their claims to the union nor have Plaintiffs contended that the union wrongfully refused to pursue their claims.  For all of the foregoing reasons, the Court finds no merit in

Plaintiffs claim that they cannot be obligated to arbitrate their dispute.

Nor does the Court find any merit in Plaintiffs claim that they cannot be required to arbitrate their ERISA claim (Count II) under the arbitration provision contained in the Termination Agreement.  As indicated, the arbitration provision is a broad one, requiring submission to arbitration of "*all disputes or claims* arising out of any alleged violation of. . . this Termination Agreement. . . ."  Defendants' Ex. B, Art. 10.  As the Second Circuit found in  *Service Workers Local 4-5025 v. E.I. duPont de Nemours & Co*., 565 F.3d 99 (2nd Cir. 2009), where the arbitration provision in the CBA is broad and the disputed issue is not whether any particular employee is eligible under the terms of the plan, but rather whether the employer violated the CBA by unilaterally modifying these terms, the matter is subject to arbitration.  *See also Schweizer Aircraft Corp. v. Local 1752*, 29 F.3d 83, 86 (2d Cir.1994) (where a complaint does not "implicate[ ] the responsibilities of the Plan's administrators," but is "directed only at the responsibility imposed . . . under the CBA," arbitration, if called for by the CBA, is appropriate); *DuPont v. Ampthill Rayon Workers, Inc.*, 290 Fed. Appx. 607, 612 (4th Cir.2008) (upholding order of arbitration and noting that "[w]hile it is true that the result of the plans' amendments will decrease the benefits available to certain DuPont employees, [the plaintiff's] breach of contract claims are premised on the fact that such changes violate the terms of the CBAs. As a result, DuPont's argument . . . is inapposite to the issue of what forum should determine whether the amendments violated the CBAs.").

As in the above-cited cases, Plaintiffs' Count II, though couched as a violation of

ERISA, is predicated entirely upon Newcor's alleged breach of its promise "to provide Plaintiffs and their eligible dependents with the negotiated level of health care benefits for the duration of their lives." [Complaint, ¶ 30.] This is a responsibility imposed upon Defendant Newcor under the CBA. It does not implicate a welfare plan's administrator's responsibility to determine health care benefit eligibility. The Sixth Circuit has repeatedly emphasized,

> where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability [and] resolve any doubts in favor of arbitration, . . .unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Cooper Tire & Rubber Co.*, 474 F.3d at 277-78; *see also Int'l Union v. Cummins, Inc*., 434 F.3d 478, 485 (6th Cir.2006)

The Court cannot say with positive assurance that the arbitration clause in the Termination Agreement in this case is not susceptible of an interpretation that it covers Plaintiffs' ERISA claim in this action. Therefore, the Court concludes that Plaintiffs' ERISA claim, like their LMRA claim, is subject to arbitration as provided in the Dispute Resolution provision of the Termination Agreement.

For all of the foregoing reasons, the Court finds that Plaintiffs have failed to establish a substantial likelihood of success on the merits of the claims presently before this Court.

2.      IRREPARABLE HARM

The second factor the Court must balance is whether Plaintiffs have demonstrated

that they will suffer irreparable harm absent the injunctive relief requested. While there is

no set definition of "irreparable injury," *see e.g., City of Benton Harbor v. Richardson*,

429 F.Supp. 1096 (W.D.Mich.1977), the moving party must demonstrate a

noncompensable injury, for which there is no legal measure of damages. *Fox v. Massey-*

*Ferguson, Inc.* 172 F.R.D. 653, 680 (E.D. Mich. 1995), *aff'd sub nom Fox c. Varity Corp.*,

91 F.3d 143 (6th Cir. 1996); *Merrill, Lynch, Pierce, Fenner & Smith v. E.F. Hutton*, 403

F.Supp. 336, 343 (E.D.Mich.1975); *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1267

(W.D. Mich. 1990).

  As proof of irreparable harm in this case, the Plaintiffs present their own

Declarations showing that they will be required to shoulder a huge financial burden to

maintain health care coverage for themselves and their wives. They have not, however,

demonstrated a "noncompensable injury, for which there is no legal measure of damages."

The evidence presented by Plaintiffs shows only that it will cost them much more than the

portion they were required to pay their former employer for the employer-provided

coverage to obtain insurance coverage themselves. There is clearly a legal measure of

their damages. The Court acknowledges that other courts have found the added financial

burden of medical costs to constitute irreparable harm to retirees. *See e.g., Yolton v. El*

*Paso Tennesse Pipeline Co.*, 318 F. Supp. 2d 455 (E.D. Mich. 2005), *aff'd*, 435 F.3d 571

(6th Cir. 2006); *Cole v. ArvinMeritor, Inc.*, 516 F. Supp. 2d 850 (E.D. Mich. 2005);

*Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410 (E.D. Mich. 1994), *aff'd*, 93 F.3d 648 (6th

Cir.), *cert. denied*, 519 U.S. 807 (1996). However, given that there is a legal measure for

Plaintiffs' damages, the Court cannot say that Plaintiffs' have presented such strong evidence of irreparable harm to tip the scales in their favor on this factor.

3.     HARM TO OTHERS

With respect to the third preliminary injunction element -- harm to others --  the only evidence of harm that third parties that has been presented here is the Plaintiffs' declarations of the derivative harm that their spouses will suffer if a preliminary injunction is not issued to maintain their employer-provided health insurance.  However, as indicated above, this harm is compensable by way of a monetary award.  Therefore, the Court does not find that Plaintiffs have shown that this factor weighs heavily in favor of injunctive relief.

4.     PUBLIC INTEREST

Similarly, the public interest factor does not tip strongly in favor of one party or the other.  As Plaintiffs point out, the public has a legitimate interest in protecting legitimate expectations of retirees that their health insurance will be provided for the rest of their lives. *Schalk v. Teledyne, Inc*., *supra*, 751 F. Supp. at 1268 (W.D. Mich. 1990). By the same token, the public has an important interest in the enforcement of contracts, and, therefore, if the courts were to refuse to enforce *all* of the terms of the contracts as entered into by the parties, they would be undermining the legitimate business expectations of not only the parties in the case, but of all contracting parties.  *See Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Ran*, 67 F. Supp. 2d. 764, 781 (E.D. Mich. 1999).  Therefore, the Court cannot say that this factor tips heavily in favor of either party.

In sum, after balancing the four factors, the Court finds that Plaintiffs are not entitled to the preliminary injunctive relief requested. Plaintiff DeGraeve has not shown any contractual basis for his claim for lifetime medical benefits and Plaintiffs Burcicki and Zaparanuk's sole recourse under the Agreements they rely upon is to proceed through the collectively-bargained arbitral process.

Defendants have requested that the Court order that this case be stayed to allow Plaintiffs to proceed with an arbitration claim. The Court agrees. Therefore, the Court will direct Plaintiffs to demand arbitration and that further proceedings in this case, including proceedings on Defendants' counterclaims, should be stayed until that arbitral process has been exhausted.

<u>CONCLUSION</u>

For all of the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction **[Dkt. # 10]** is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Schedule Hearing on Plaintiffs' Motion for Preliminary Injunction **[Dkt. # 27]** is denied as MOOT.

IT IS FURTHER ORDERED that Plaintiffs' Burcicki and Zaparanuk are directed to proceed with arbitration of their claims pursuant to the Dispute Resolution provision in the 1991 Termination Agreement.

IT IS FURTHER ORDERED that all proceedings in this case are STAYED

pending exhaustion of the arbitral process.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 23, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 23, 2010, by electronic and/or ordinary mail.

s/Ruth Brissaud
Case Manager